IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

UNITED STATES OF AMERICA,        CR 01-336-BR

        Plaintiff,        OPINION AND ORDER

v.

FILIMON GARCIA-BELTRAN,

        Defendant.

**KARIN J. IMMERGUT**
United States Attorney
**FRANK NOONAN**
Assistant United States Attorney
1000 S.W. Third Ave., Suite 600
Portland, OR  97204
(503) 727-1000

        Attorneys for Plaintiff

**STEVEN T. WAX**
Federal Public Defender
**NANCY S. BERGESON**
Assistant Federal Public Defender
101 S.W. Main Street, Suite 1700
Portland, OR  97204
(503) 326-2300

        Attorneys for Defendant

1  -  OPINION AND ORDER

**BROWN, Judge.**

The Ninth Circuit remanded this matter and directed the Court to conduct an evidentiary hearing, to make factual findings, and, in light of those findings, to determine whether Defendant Filimon Garcia-Beltran's Motion to Suppress (#22), which was originally denied, now should be granted.

This Court conducted the evidentiary hearing on April 6, 2005. The parties thereafter submitted supplemental briefing, and the Court took the matter under advisement on May 19, 2005.

For the reasons that follow, the Court finds the government obtained from Garcia-Beltran, following his illegal arrest, the third of three sets of fingerprints in part for investigative purposes, and, therefore, the Court **GRANTS** Garcia-Beltran's Motion to Suppress as to the Third Set of Fingerprints.

## PROCEDURAL BACKGROUND

In an Indictment filed August 22, 2001, the Grand Jury charged Garcia-Beltran with three counts of Illegal Entry and Re-entry in violation of 8 U.S.C. §§ 1326(a), 1326(b)(2), and 1325(a). In September 2002, the Honorable Helen J. Frye, United States District Judge, heard Garcia-Beltran's Motion to Suppress in which he sought to suppress all "identity evidence" that the government obtained after arresting Garcia-Beltran, including fingerprints, statements, and photographs. Although the

government conceded the police did not have probable cause to arrest Garcia-Beltran, it argued the Court should deny Garcia-Beltran's Motion to Suppress because evidence of identity does not implicate the Fourth Amendment.  Judge Frye agreed and denied the Motion.

Garcia-Beltran then entered into a conditional Plea Agreement with the government and pled guilty to Count One.  In March 2003, this Court sentenced Garcia-Beltran to a 63-month prison term on Count One and dismissed the remaining counts pursuant to the conditional Plea Agreement.

As permitted by his conditional Plea Agreement, Garcia-Beltran appealed the denial of his Motion to Suppress.

In its decision issued November 18, 2004, the Ninth Circuit vacated Garcia-Beltran's conviction and, as noted, remanded the matter to this Court to conduct an evidentiary hearing and to make factual findings concerning the government's purpose(s) in fingerprinting Garcia-Beltran.[1]  See *United States v. Garcia-Beltran*, 389 F.3d 864 (9th Cir. 2004).  In light of those findings and the standards set forth in the Ninth Circuit's decision, this Court also must determine whether Garcia-Beltran's Motion to Suppress should now be granted.

---

[1] In a footnote, the Ninth Circuit also suggests the Court determine whether to suppress photographs of Garcia-Beltran.  The parties, however, did not offer any evidence or make any arguments at the evidentiary hearing concerning photographs.  The Court, therefore, assumes photographs are no longer at issue.

## STANDARDS

It is well-settled that "[t]he 'body' or identity of a defendant or respondent in a criminal or civil proceeding is never itself suppressible as a fruit of an unlawful arrest, even if it is conceded that an unlawful arrest, search, or interrogation occurred." *INS v. Lopez-Mendoza*, 468 U.S. 1032, 1039 (1984). This rule applies equally in a prosecution for illegal entry under 8 U.S.C. § 1326(a):

> A defendant's identity need not be suppressed merely because it is discovered as the result of an illegal arrest or search. "[T]here is no sanction to be applied when an illegal arrest only leads to discovery of the man's identity."

*United States v. Guzman-Bruno*, 27 F.3d 420, 421-422 (9th Cir. 1994)(quoting *Hoonsilapa v. INS*, 575 F.2d 735, 738 (9th Cir.), *modified by* 586 F.2d 755 (9th Cir.1978)). *See also United States v. Del Toro Gudino*, 376 F.3d 997, 1001 (9th Cir. 2004) ("We continue to hold today that the simple fact of who a defendant is cannot be excluded, regardless of the nature of the violation leading to his identity."). Thus, the Ninth Circuit held fingerprints taken in a § 1326(a) prosecution five months after a suppression hearing and solely for identification purposes (*i.e.*, to verify the person who is fingerprinted is who he says he is) were admissible because evidence of "identity" is not suppressible under *Lopez-Mendoza*. *United States v. Parga-Rosas,* 238 F.3d 1209, 1214 (2001).

In *Parga-Rosas*, there were two sets of fingerprints at issue: an initial set taken shortly after agents interrogated Parga-Rosas without advising him of his *Miranda* rights and a second set taken five months after the district court granted his motion to suppress. Although the Ninth Circuit did not address the exclusion of the first set of fingerprints, it upheld the admission of the second set of fingerprints because "[t]he purpose of taking the second set of fingerprints was not to connect Parga-Rosas to a crime with which he was not already connected (*i.e.*, for an investigative purpose); rather, the fingerprints could serve only to further establish his identity." *Id.*

Nonetheless, it is still possible that fingerprints taken after an illegal arrest and for an "investigatory" purpose should be suppressed. *United States v. Garcia Beltran*, 389 F.3d at 866. "*Lopez-Mendoza* does not preclude suppression of evidence unlawfully obtained from a suspect that may in a criminal investigation establish the identity of the suspect." *Id.* at 867.

Applying *Parga-Rosas*, the Ninth Circuit gave this Court the following guidance:

> Thus, on remand, if the district court finds that the intent of taking Garcia-Beltran's fingerprints was *solely* for identification purposes, then this case is controlled by *Parga-Rosas* and Garcia-Beltran's argument must be rejected. On the other hand, if the district court finds on remand that the intent at the time of

taking Garcia-Beltran's fingerprints was *solely* for
investigative purposes, then it is likely that *Hayes*
and *Davis* control and the fingerprints must be
excluded.

*United States v. Garcia-Beltran*, 389 F.3d at 867 (citing *Hayes v.*

*Florida*, 470 U.S. 811 (1985), and *Davis v. Mississippi*, 394 U.S.

721 (1969)(emphasis added)).  The Ninth Circuit noted the Court

in *Hayes* "reaffirmed the principle that the Fourth Amendment does

not permit admission of fingerprint evidence resulting from a

seizure without reasonable suspicion that the individual has

committed a criminal act*." U.S. v. Garcia* Beltran, 389 F.3d at

867.

The Ninth Circuit then framed this Court's "ultimate" task

on remand as follows:

> Here, the ultimate question that the district court
> must answer on the basis of a more complete evidentiary
> record is:  were Garcia-Beltran's fingerprints taken
> for an investigatory, or identification, purpose *(or
> both)*?  We recognize that in the investigation of
> immigration offenses, establishing the identity of the
> suspect is an essential component of such an
> investigation.  Yet, the need to establish identity
> does not mean that any evidence that leads to the true
> identity of the suspect is automatically exempt from
> the exclusionary rule.
>
>                          * * *
>
> Thus, on remand, if the evidence were to show that as a
> consequence of the illegal arrest of Garcia-Beltran,
> law enforcement officials obtained his fingerprints to
> pursue a criminal immigration law violation, the
> fingerprints would be subject to suppression unless
> they were obtained by "means sufficient to have purged
> the taint of the initial illegality."

*Id.* (internal citation omitted; emphasis added).

Finally, the Ninth Circuit cited with approval an Eighth Circuit case in which the court applied the exclusionary rule to fingerprints taken after agents interviewed an alien:

> The Eighth Circuit's analysis of the defendant's Fourth Amendment challenge to the fingerprints provides helpful guidance in determining whether fingerprint exemplars obtained following an illegal arrest should be suppressed. As the Eighth Circuit concluded: "[W]e find it significant that the fingerprinting occurred only after the INS had interviewed Guevara-Martinez. The government has offered no evidence that the fingerprints were obtained as a matter of course through routine booking procedures, rather than for the purpose of assisting the INS investigation. The absence of evidence that the fingerprinting resulted from routine booking, and the concomitant inference that an INS-related purpose motivated the fingerprinting, also counsel in favor of applying the exclusionary rule."

*Id.* (quoting *United States v. Guevara-Martinez*, 262 F.3d 751, 756 (8th Cir.2001)).


## **FACTUAL BACKGROUND**

The arrest of Garcia-Beltran by Portland Police Officer Hubbard occurred on August 14, 2001, at approximately 00:25 a.m. Although Officer Hubbard did not testify at the April 6, 2005, evidentiary hearing, his "Custody Report" was received in evidence as a business record over Garcia-Beltran's objection. The Court summarizes that report to provide background and context for the Court's Findings of Fact:

Shortly after midnight on August 14, 2001, Portland Police

Officers Hubbard and Luiz saw the man later identified as Garcia-Beltran with several others at the west end of the Burnside Bridge, which Officer Hubbard described in his report as a "high vice area." When Officer Hubbard saw a white male run away from Garcia-Beltran, he suspected police presence had interrupted a drug transaction between the man and Garcia-Beltran. Officer Hubbard also suspected Garcia-Beltran was hiding illegal drugs in his mouth because he was "chewing and swallowing furiously." Officer Hubbard grabbed Garcia-Beltran's jaw in an "unsuccessful attempt" to acquire evidence.

Nonetheless, Officer Hubbard handcuffed and arrested Garcia-Beltran and took him to the nearby "Old Town Precinct," a storefront-type office maintained by the Portland Police Bureau. As noted, the government concedes Officer Hubbard lacked probable cause to support this arrest.

After they were at Old Town Precinct, Garcia-Beltran produced a "Resident Alien Card" and a Mexican "voting card" in the name of "Jose Luis Garcia-Hernandez." According to Officer Hubbard's report, both cards had "a raised photograph" that did not match Garcia-Beltran's face. Officer Hubbard concluded these cards were forgeries, and, "in lieu of criminal prosecution" for a drug charge, Officer Hubbard issued Garcia-Beltran a "Uniform Criminal Citation" in the name of Jose Luis Garcia-Hernandez accusing him of the crime of "Forgery 2" in violation of Oregon

law and directing him to appear in state court to answer that charge on September 12, 2001. Officer Hubbard ends his report with this statement: "I took [Garcia-Beltran] to MCDC for mug/print."[2]

Because the only charge then existing against Garcia-Beltran was based on a citation in lieu of arrest, the Court infers Garcia-Beltran would have been released from MCDC following the "mug/print" procedure unless a basis to hold him further arose during the process.

The Court notes the appellate record in this case suggests Garcia-Beltran was arrested as part of an "INS sweep." That conclusion seems to have been based on after-the-fact speculation arising from the fact that there was not any reference in the MCDC booking records to Officer Hubbard's Custody Report. The lack of such a reference probably occurred because Officer Hubbard cited Garcia-Beltran in lieu of arrest on the forgery charge, and, therefore, Officer Hubbard did not book Garcia-Beltran into "custody" at MCDC on the forgery charge.

## FINDINGS OF FACT

To the extent the Ninth Circuit directs this Court on remand to make findings of fact as to the basis of Garcia-Beltran's

---

[2] "MCDC" is the abbreviation for Multnomah County Detention Center, which is the county booking facility and jail in downtown Portland, Oregon.

arrest, the Court finds:

Officer Hubbard erroneously "arrested" Garcia-Beltran based on his belief that he had probable cause to charge Garcia-Beltran with a drug crime and not as part of any "INS sweep." Officer Hubbard's Citation to Garcia-Beltran charged him only with "Forgery 2," however, and did not result in Garcia-Beltran being held in custody at MCDC. Instead Hubbard left Garcia-Beltran at MCDC merely for a "mug/print" procedure. During that process, the Portland Police Bureau issued the "Special Report" described below. In turn, immigration officials placed a detainer on Garcia-Beltran, and he has not been out of custody since that time.

Having weighed and evaluated all of the testimonial and documentary evidence presented at the April 6, 2005, evidentiary hearing, the Court also finds the following facts by a preponderance of the evidence:

After Officer Hubbard transported Garcia-Beltran to MCDC, Portland Police/Sergeant Joel A. Mann obtained the first of three sets of Garcia-Beltran's fingerprints (the First Set of Fingerprints) as part of the "mug/print" process. Another Police Bureau identification technician (McShane) conducted a records search and determined Garcia-Beltran previously was identified by the Portland Police Bureau as "Garcia, Filimon Beltran, DOB 112264" and by immigration authorities as "Garcia-Beltran,

Taurino" with an associated FBI number and an immigration "A-File."

While Garcia-Beltran was still at MCDC for the "mug/print" procedure, the Portland Police Bureau sent a facsimile transmission of a "Special Report" to federal immigration officials at 4:15 a.m. The "Subject-of-this-Report" section indicates "Furnishing False Information to Officer" and sets out in part:

> This subject [Garcia-Hernandez, Jose Luis, DOB 112272] is identified by AFIS fingerprint comparison as (state) identification number:
>
> OR 789 1272 as (PPB) Garcia, Filimon Beltran, DOB 112264
>
> A 77145131 as Garcia-Beltran, Taurino
>
> MCL 789625 assigned to this arrest. FBI # 767 623 JA7 connected with the ___ record(s). INS #A as above is part of NCIC CCH/III record.

Immigration officials treat such a report as a "criminal alien referral";[3] that is, as a means for the Portland Police Bureau to notify immigration authorities about any arrested person who police have reason to believe may be a "criminal alien." Immigration officials, in turn, use such a report "to help . . . make a positive identification that the person [who]

---

[3] In these Findings of Fact, quoted language not otherwise identified is taken from the exact words of Immigration and Customs Enforcement Special Agent Barrett Salvetto during his testimony at the evidentiary hearing. The Court finds his exact words are relevant to the task of determining the purpose(s) for which Garcia-Beltran's fingerprints were taken at various times.

was arrested is a criminal alien."

As noted, this Report included a reference to "A 77145131 as Garcia-Beltran, Taurino." "A" in this context refers to a person's "A-File," which is the "sole repository of all immigration contacts with a particular alien." In fact, A-File No. 77145131 is the A-File for "Taurino Garcia-Beltran," and it contains "his criminal alien record," including a Warrant of Deportation that previously was executed on March 1, 2001.

When immigration officials received the Special Report, they regarded it as conclusive evidence that Garcia-Beltran had been positively identified through fingerprints as a "criminal alien." With such information in hand, it is "automatic" to place a detainer immediately to ensure the person is not released before immigration authorities can act.

Thus, at 7:21 a.m, immigration officials sent a teletype to MCDC with the following message:

> Please place an INS Detainer on the following subject:
>
> NAM: Garcia, Filimon Betran aka Garcia-Hernandez, Jose
>       Luis
> INS: A77 145 131  aka:  Garcia-Beltran, Taurino
> FBI: 767623JA7
> SID: OR7891272
> DOB: 11/2264
> INMATE #:  SWIS:623197
>
> Please notify INS Immediately if the subject is moved
> or becomes an exclusive INS Prisoner.  INS will not
> take Custody or Incur a Jail Expense until Notified by
> Telex/tty that the subject is an exclusive INS
> Prisoner.

In addition, at 7:25 a.m., immigration authorities queried NCIC and obtained a copy of Garcia-Beltran's NCIC criminal history. The printout includes notations in 1991, 1994, and 1995 for charges of illegal entry. With the A-File information that Garcia-Beltran had been deported just months earlier, immigration authorities clearly were on notice by this point that there was cause to believe Garcia-Beltran was guilty of at least one recent act of illegal re-entry.

At 1:16 p.m. on August 14, 2001, MCDC sent a teletype to immigration authorities with the following message:

> Re: Garcia, Filimon Beltran  SWIS/ 623197
> INS/A77145131 aka/ Garcia-Hernandez, Jose Uis
>
> Per your TTY, a hold has been placed on the above subject. He was cited to appear on his local charge of Forgery II. Subject is being held solely on your Tty request. Subject is your exclusive prisoner and billing begins today.

Immigration authorities routinely fingerprint every alien who is taken into physical custody for the purpose of putting "a record of their detention by our deportation section into their A File as a record that they were in our custody." In the event records of a previous deportation already exist, however, immigration authorities also expect to use such routine prints as an additional means "to positively identify that the person we have in custody was, in fact, the person that was actually deported." In this manner, immigration officials use such "routine" fingerprints to determine who they should refer to the

United States Attorney for prosecution for illegal entry.

On August 15, 2001, the day after Garcia-Beltran came into federal custody, immigration authorities fingerprinted him (the Second Set of Fingerprints) for the "routine" purpose of putting "a record of [his] detention . . . into [his] A File as a record that [he was] in our custody." As noted, however, immigration authorities already were aware of a previous deportation of Garcia-Beltran. Thus, the purpose of this Second Set of Fingerprints was also "to positively identify that the person we have in custody was, in fact, the person that was actually deported."

At the request of immigration authorities, Portland Police Sergeant/Criminalist J. Kipp examined the Second Set of Fingerprints and compared them to the fingerprint on the reverse side of the Warrant of Deportation contained in Garcia-Beltran's A-File. On August 18, 2001, he notified ICE SA Salvetto that

> the "inked impression [of the Warrant fingerprint] of the distal phalange for this alien is not identifiable. However, there are enough points of identification on the medial phalange portion of the inked impression on the Warrant of Deportation to make identification, but the impression of finger #2 on the ten-print card [Second Set] does not include enough of the medial phalange to make identification.
>
> If you have access to the alien in question, I need another inked impression of finger#2 to make identification. Be certain the person taking the impression rolls the entire finger as well as taking a flat impression of the entire finger with emphasis on the medial phalange . . . .

In response, SA Salvetto arranged for Garcia-Beltran to be fingerprinted again (Third Set of Fingerprints) on August 21, 2001, at 7:21 a.m., to obtain a clear image of the area below the top of Garcia-Beltran's right index finger for purposes of further comparison with the Warrant print. On August 21, 2001, Sergeant/Criminalist Mann certified: (a) he examined the right index fingerprint on the Warrant dated October 18, 1999, in the name of "Garcia-Beltran, Taurino," submitted to him by SA Salvato [*sic*]; (b) he compared the Warrant fingerprint to "the inked impressions of the fingerprint exemplar from the files of USINS bearing the name of Garcia-Beltran, Filimon" [Third Set of Fingerprints]; and (c) both prints were made by the same person.

As noted, the Indictment in this case was filed the next day.

## <u>DISCUSSION</u>

In its Post-hearing Supplemental Memorandum Opposing Suppression, the government narrows the factual issues for the Court to resolve. For purposes of the April 6, 2005, evidentiary hearing and the Court's tasks on remand, the government (1) confirmed its initial concession that Garcia-Beltran's arrest was made without probable cause; (2) conceded the First Set of Fingerprints should be suppressed on the assumption that they were obtained for an investigative purpose

and, therefore, are subject to the exclusionary rule; and (3) asserted it does not intend to use the Second Set of Fingerprints at trial despite arguing they "would not be suppressible."  Based on these positions, therefore, the Court need only answer the Ninth Circuit's remand questions with respect to the Third Set of Fingerprints.

The government argues the Third Set of Fingerprints was not "investigatory" because, by the time they were taken, Garcia-Beltran already was known to be an illegal alien and thereby connected to the crime of illegal entry.  The government, therefore, contends the "investigation was complete," and Garcia-Beltran's fingerprints were obtained to prove his identity rather than to connect him to a crime.  Moreover, the government argues this case is indistinguishable from *Parga-Rosas* in which, as noted, the Ninth Circuit admitted a second set of fingerprints taken after a motion to suppress was denied because "[t]he purpose of taking the second set of fingerprints was not to connect Parga-Rosas to a crime with which he was not already connected (*i.e.*, for an investigative purpose); rather, the fingerprints could serve only to further establish his identity." *Parga-Rosas*, 238 F. 3d at 1214.

In response to the government's contentions, Garcia-Beltran points to several differences between this case and *Parga-Rosas*:

> First, Mr. Parga-Rosas had been arrested and indicted
> for illegal reentry.  Second, the fingerprints were

> taken four months after Mr. Parga-Rosas' arrest.
> Third, when Mr. Parga-Rosas initially came into contact
> with police, he was asked for identification.  He
> produced a green card, which enabled border patrol to
> access his immigration file; this connection was made
> independently of the subsequent un-*Mirandized*, illegal
> questioning.  Fourth, the decision devoted little
> analysis to the issue, simply concluding that the
> fingerprints taken four months after Parga-Rosas'
> arrest were not investigatory.

The Court agrees these factors distinguish *Parga-Rosas* from this case.  In addition, the Court notes the government seems to ignore that aspect of SA Salvetto's testimony in which he acknowledged that authorities already aware of existing records of a previous deportation expect to use "routine" prints "to positively identify that the person we have in custody was, in fact, the person that was actually deported" and, ultimately, to determine who to refer for prosecution.  In such cases, therefore, "routine" prints are taken for both investigatory and identification purposes.

As noted, the Ninth Circuit gave this Court explicit directions in the event the Court found the government acted "solely" for an identification purpose or "solely" for an investigatory purpose.  *United States v. Garcia-Beltran,* 389 F.3d at 867.  On this record, however, the Court is unable to make a finding of any singular purpose.  Indeed, as noted, the Ninth Circuit recognized the possibility of dual purposes:

> Here, the ultimate question that the district court
> must answer on the basis of a more complete evidentiary
> record is:  were Garcia-Beltran's fingerprints taken

> for an investigatory, or identification, purpose (*or both*)?  We recognize that in the investigation of immigration offenses, establishing the identity of the suspect is an essential component of such an investigation.  *Yet, the need to establish identity does not mean that any evidence that leads to the true identity of the suspect is automatically exempt from the exclusionary rule.*
>
> * * *
>
> *Thus, on remand, if the evidence were to show that as a consequence of the illegal arrest of Garcia-Beltran, law enforcement officials obtained his fingerprints to pursue a criminal immigration law violation, the fingerprints would be subject to suppression unless they were obtained by "means sufficient to have purged the taint of the initial illegality."*

*Id.* at 867 (internal citation omitted; emphasis added).

It is without doubt that immigration officials obtained Garcia-Beltran's Third Set of Fingerprints "as a consequence" of his illegal arrest on August 14, 2001, because the illegal arrest led to Portland Police making a "criminal alien referral" to ICE. In turn, ICE used the First Set of Fingerprints to link Garcia-Beltran to his A-File, to the 1999 Warrant of Deportation bearing his index fingerprint, and to his NCIC criminal history showing three previous arrests for illegal entry, and ICE intended to use both the Second and the Third Set of Fingerprints to link Garcia-Beltran to the Warrant of Deportation.

In the context of this case, the act of obtaining the Third Set of Fingerprints only after unsuccessfully comparing the Second Set of Fingerprints to the Warrant of Deportation is somewhat similar to the decision of immigration authorities in

*United States v. Guevara-Martinez* to take fingerprints only after interviewing the alien.  262 F.3d 751, 756, (8th Cir. 2001).  In the absence of evidence that the fingerprinting resulted from routine booking, the Eighth Circuit inferred "an INS-related purpose motivated the fingerprinting" and, in turn, "counsel[led] in favor of applying the exclusionary rule."  *Id.*

As noted, the Ninth Circuit found *Guevara-Martinez* provided "helpful guidance" for the determination of whether "fingerprint exemplars obtained following an illegal arrest should be suppressed."  *United States v. Garcia-Beltran*, 389 F. 3d at 867. Although it was "routine" in this case for ICE to have Garcia-Beltran printed "to put a record of [his] detention by [the ICE] deportation section into [his] A file as a record that [he] was in [ICE] custody," it was not "routine" in the same sense to re-print him for purposes of linking him to the previous Warrant of Deportation and determining whether to refer him for prosecution.

Thus, because immigration officials obtained Garcia-Beltran's Third Set of Fingerprints "as a consequence" of his illegal arrest, the Court must suppress them "unless they were obtained by 'means sufficient to have purged the taint of the initial illegality.'"  *Id*.  Here the government obtained the Third Set of Fingerprints only seven days after Garcia-Beltran's

illegal arrest, which was the day before the Grand Jury indicted him, and in a direct sequence of events tracing back to the illegal arrest. As noted, the period in this case is significantly shorter than the one in *Parga-Rosas*, which was five months after the order granting the defendant's motion to suppress and, presumably, long enough after the illegal un-*Mirandized* statement to purge "the taint of the initial illegality."

Although the government continues to argue it had only "routine" identification purposes in mind when it obtained the Third Set of Fingerprints, the government does not offer nor does the Court find a basis for concluding these fingerprints "were obtained by 'means sufficient to have purged the taint of the initial illegality.'" Accordingly, the Court concludes it must suppress the Third Set of Fingerprints.

<u>**CONCLUSION**</u>

For these reasons, the Court finds the government obtained the third of three sets of fingerprints from Garcia-Beltran in part for investigative purposes, and, therefore, the Court **GRANTS** the Motion to Suppress (#22) as to the Third Set of Fingerprints.

The Court directs the parties to confer and to appear for a status conference at 11:00 a.m., June 16, 2005, in order for the government to state its intentions regarding further proceedings.

IT IS SO ORDERED.

DATED this 9th day of June, 2005.


/s/ Anna J. Brown

_____
ANNA J. BROWN
United States District Judge